## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERT CLARK, Derivatively on Behalf of ANTARES PHARMA, INC., | ) ) ) | Civil Action: 18-CV-00703 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **VERIFIED SHAREHOLDER** **DERIVATIVE COMPLAINT** |
| ROBERT F. APPLE, THOMAS J. GARRITY, JACQUES GONELLA, LEONARD S. JACOB, MARVIN SAMSON, ANTON G. GUETH and ROBERT P. ROCHE, JR., | ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) ) | |
| and, | ) ) ) | |
| ANTARES PHARMA, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

Plaintiff Robert Clark ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Antares Pharma, Inc. ("Antares" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Antares with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Antares against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties, abuse of control, waste of corporate assets, unjust enrichment and violations of Section 14(a) of the Securities Exchange Act of 1934 that occurred and have caused substantial harm to Antares.

## JURISDICTION

2.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of fees and costs.

3.      This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the claims arise under and pursuant to § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. § 240.14a-9).

4.      Venue is proper in this Court because the Company maintains its executive office at 100 Princeton South, Suite 300, Ewing, New Jersey 08628, a substantial portion of the transactions and wrongs complained of herein occurred in New Jersey, and Defendants have received substantial compensation within the District of New Jersey by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

**A.      Plaintiff**

5.      ***Plaintiff Robert Clark*** is, and was, a shareholder of Antares during the time Defendants were breaching their fiduciary duties.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Texas.

**B.** **Nominal Defendant**

6. ***Nominal Defendant Antares*** is incorporated in Delaware, with principal executive offices located at 100 Princeton South, Suite 300, Ewing, New Jersey 08628.

**C.** **Director Defendants**

7. ***Defendant Robert F. Apple*** ("Apple") was promoted to President and Chief Executive Officer (CEO) in January 2016 and was appointed to the Board of Directors in March 2016. Apple joined the Company in February 2006 as Senior Vice President, Chief Financial Officer ("CFO") and Corporate Secretary and in 2009 was promoted to the position of Executive Vice President, CFO and President of the Parenteral Products Division. In September 2014, Apple was promoted to the position of Executive Vice President, Chief Operating Officer of the Company. Defendant Apple is a citizen of Pennsylvania.

8. ***Defendant Thomas J. Garrity*** ("Garrity") joined the Board in October 2003 and serves as Chairman of the Company's Audit Committee and as a member of the Company's Governance and Nominating Committee. Defendant Garrity is a citizen of Pennsylvania.

9. ***Defendant Jacques Gonella*** ("Gonella") has served on the Board since 2001 and served as the Chairman of the Board from January 2001 to October 2008. Gonella served as a member of the Company's Governance and Nominating Committee until February 2015. Defendant Gonella is a citizen of Switzerland.

10. ***Defendant Leonard S. Jacob*** ("Jacob") has served as the Chairman of the Board since October 2008. Jacob joined the Board in January 2007 and is the Chairman of the Company's Governance and Nominating Committee and is a member of the Company's Compensation Committee. Defendant Jacob is a citizen of Pennsylvania.

11. ***Defendant Marvin Samson*** ("Samson") joined the Board in May 2013 and is a

member of the Company's Compensation Committee.  Samson served as a member of the Company's Governance and Nominating Committee until February 2015.  According to the Company's 2016 Proxy, Samson is an expert in injectable manufacturing and delivery systems. Defendant Samson is a citizen of New Jersey.

12.      **Defendant Anton G. Gueth** ("Gueth") joined the Board in October 2003 and serves as Chairman of the Company's Compensation Committee and as a member of the Company's Audit Committee and our Governance and Nominating Committee.  Defendant Gueth is a citizen of California.

13.      **Defendant Robert P. Roche, Jr.** ("Roche") joined the Board in July 2013 and is a member of the Company's Audit Committee.  Roche served as a member of the Company's Governance and Nominating Committee until February 2015.  Defendant Roche is a citizen of Pennsylvania.

14.      Defendants Apple, Garrity, Gonella, Jacob, Samson, Gueth, and Roche are hereinafter referred to as the "Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

15.      As members of Antares's Board were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

16.      The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Antares, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

4

17.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Antares, Defendants owed Antares and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Antares in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Antares and its investors.

18.     Each director of the Company owes to Antares and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19.     To discharge their duties, the officers and directors of Antares were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Antares were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

5

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how Antares conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

20.      Each of the Defendants, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Antares, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

**Background**

21.     Antares develops pharmaceutical delivery systems, including needle-free and mini-needle injector systems and transdermal gel technologies.  The Company distributes its needle-free injector systems in various countries.  Antares also conducts research and development with transdermal gel products and has several products in clinical evaluation with partners.

## FALSE AND MISLEADING STATEMENTS

22.     On December 21, 2016, the Company announced its submission of its new drug application ("NDA") for Xyosted (then known as QuickShot Testosterone or QST) to the United States Food and Drug Administration ("FDA").  The Company stated in relevant part:

> "The submission of the QST New Drug Application represents yet another significant accomplishment for the Company in 2016.  It is the first product designed for subcutaneous delivery of testosterone through a fine gauge needle in patients diagnosed with hypogonadism," said Robert F. Apple, President and Chief Executive Officer.  "We believe QST could be an excellent treatment option for men with hypogonadism.  In addition to virtually eliminating the risk of transference that exists with topical gel products and the uncomfortable deep intramuscular administration associated with current injectable therapies, the study data demonstrated that the QuickShot auto injector can provide patients with physiologically normal and steady levels of testosterone over the course of therapy.  A potential added benefits to patients is a virtually painless treatment experience as demonstrated by the pain data collected in our phase 3 program.  We will work closely with the FDA during the regulatory review process towards a potential approval with the goal of bringing this new treatment option to men diagnosed with hypogonadism."

> Two hundred and eighty-three men participated in the QST phase 3 program.   The phase 3 program consisted of a one year pivotal safety and efficacy study and a second 6-month safety study.  In the phase 3 program, patients received 75 mg of testosterone enanthate (TE) administered via the QuickShot device once-weekly for 6 weeks.   At week 7, blinded dose adjustments were made if necessary based on week 6 pre-dose blood levels.   The patients

7

continued to receive subcutaneous doses of 50 mg, 75 mg or 100 mg of testosterone weekly for up to 52 weeks.  The QuickShot testosterone auto injector has not been approved by the United States Food and Drug Administration.

23.    On February 27, 2017, the Company issued a press release entitled *Antares Pharma Announces FDA Acceptance of New Drug Application for QuickShot Testosterone*.  It was in this press release, the Company stated in relevant part:

> The FDA has assigned a Prescription Drug User Fee Act (PDUFA) date of October 20, 2017, ten months from the official NDA submission.  The PDUFA dates is the target date for the FDA to complete its review of the NDA.
>
> "The FDA's acceptance of the QuickShot testosterone NDA is an important start to the review process and marks another significant milestone for our Company," said Robert F. Apple, President and Chief Executive Officer.  "We continue to believe QST could be an excellent treatment option for men with hypogonadism based upon the positive pharmacokinetic and safety data produced in the two phase three studies now on file with the FDA.  In addition to virtually eliminating the risk of transference that exists with topical gel products and the uncomfortable deep intramuscular administration associated with current injectable therapies, we believe that the phase three studies demonstrated that weekly subcutaneous administration of testosterone using the QuickShot auto injector can provide patients with physiologically normal and steady levels of testosterone over the course of therapy.  The study data also showed patients had a virtually painless treatment experience using the device. We will work closely with the FDA during the regulatory review process towards a potential approval."

24.    On March 14, 2017, the Company filed an Annual Report on Form 10-K with the SEC.  It was in that Form 10-K that the Company announced financial and operating results for the quarter and year ended December 31, 2016 (the "2016 Form 10-K").

25.    In the 2016 Form 10-K, the Company stated in relevant part:

> We are developing QuickShot® Testosterone ("QST") for testosterone replacement therapy and submitted a 505 (b) (2) New Drug Application ("NDA") with the FDA in December 2016.  The NDA submission was accepted for standard review by the FDA and

assigned a Prescription Drug User Fee Act ("PDUFA") target date for completion of its review by October 20, 2017. We conducted a multi-center, phase 3 clinical study ("QST-13-003") evaluating the efficacy and safety of testosterone enanthate administered once-weekly by subcutaneous injection using the QuickShot® auto injector in testosterone deficient adult males, and we previously announced positive top-line pharmacokinetic ("PK") results that showed that the primary endpoint was achieved. Based upon a written response we received from the FDA related to our clinical development program for QST, we conducted an additional supplemental safety study, "QST-15-005". The study included a screening phase, a treatment titration phase and a treatment phase for evaluation of safety and tolerability assessments, including laboratory assessments, adverse events and injection site assessments. In September 2016, we announced the successful completion of the QST-15-005 study. The results of these two studies formed the clinical basis of our NDA submission for QST.

26.     On April 3, 2017, the Company issued a press release entitled *Antares Pharma Announces Poster Presentation of QuickShot Testosterone Data at the Endocrine Society Annual Meeting*. It was in that press release, the Company stated in relevant part:

> The poster, entitled "Safety, Efficacy, and Metabolic Parameters in the STEADY™ Trial of a Novel, Pre-Filled Subcutaneous Testosterone Enanthate Auto-Injector (SCTE-AI)," was authored by Christina Wang, MD, co-principal investigator for the study at Los Angeles Biomedical Research Institute and Harbor-UCLA Medical Center, Los Angeles, CA, *et al.* The submission was among a select group of key abstracts awarded the distinction of a moderated poster presentation.
>
> The dose-blind, multicenter Subcutaneous Testosterone Efficacy and Safety in Adult Men Diagnosed with Hypogonadism (STEADY™) trial of a proprietary, pre-filled auto injector enrolled 150 hypogonadal adult men with baseline testosterone (T) levels of <300 ng/dL. Patients received 75 mg of testosterone enanthate administered via auto injector once-weekly for six weeks. At week seven blinded dose adjustments were based upon the week six blood concentration levels at the end of the dosing interval (Ctrough) in the patients. The primary endpoint was the percentage of patients achieving a Cavg of 300 to 1,100 ng/dL and a key secondary endpoint was the percentage of patients with week 12 Cmax testosterone values of <1500 ng/dL. Markers of glucose metabolism (M) and insulin resistance risk (IR) were assessed via the Quantose

insulin resistance (IR) panel.   Quantose IR and M scores and cholesterol panel assessments were performed from blood samples at weeks 1, 13, 26, 38 and 52.

Of the 150 patients enrolled, 139 patients met the primary endpoint at week 12.   Overall, the study found that QuickShot® testosterone (QST) administered to hypogonadal men achieved serum testosterone levels within a clinically desirable and physiologically normal range.   Quantose™ IR and M scores suggested a large portion of the patient population exhibited a prediabetic/diabetic phenotype at baseline, and insulin resistance scores were decreased from baseline throughout the treatment period.   Total cholesterol, triglycerides, LDL and HDL levels decreased with treatment. According to the investigators, QST was found to be safe, well tolerated and virtually pain free.

"We are pleased that data from our phase 3 QuickShot testosterone study has been accepted for presentation at the annual ENDO 2017 meeting," said Robert F. Apple, CEO of Antares Pharma.  Mr. Apple continued, "We believe data compiled to date from our QST clinical program have shown that adult men diagnosed with hypogonadism can achieve a steady pharmacokinetic profile for testosterone well within the physiologically normal range over the course of therapy. We also believe QST has been shown to be well tolerated and virtually painless.  We will continue to work closely with the FDA during the regulatory review process toward a potential approval."

27.    On May 9, 2017, the Company filed a Quarterly Report on Form 10-Q with the SEC.  It was in this Form 10-Q that the Company announced financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q").

28.    In the Q1 2017 Form 10-Q, the Company stated in relevant part:

**Overview of Clinical, Regulatory and Product Development Activities**

We are developing QuickShot Testosterone ("QST") for testosterone replacement therapy, and submitted a 505 (b) (2) New Drug Application ("NDA") to the FDA in December 2016.  The NDA submission was accepted for standard review by the FDA and assigned a Prescription Drug User Fee Act ("PDUFA") target date for completion of its review by October 20, 2017.  We conducted a multi-center, phase 3 clinical study ("QST-13-003") evaluating the efficacy and safety of testosterone enanthate administered once-

10

weekly by subcutaneous injection using the QuickShot® auto injector in adult males diagnosed with testosterone deficiency, and we previously announced positive top-line pharmacokinetic results that showed that the primary endpoint for this study was achieved. Based upon a written response we received from the FDA related to our clinical development program for QST, we conducted an additional supplemental safety study QST-15-005. The study included a screening phase, a treatment titration phase and a treatment phase for evaluation of safety and tolerability assessments, including laboratory assessments, adverse events and injection site assessments.  In September 2016, we announced the successful completion of the QST-15-005 study. The results of these two studies formed the clinical basis of our NDA submission for QST and are further discussed in the "Research and Development Programs" section below.

29.     On August 8, 2017, the Company filed a Quarterly Report on Form 10-Q with the

SEC.  It was in that Form 10-Q that the Company announced the financial and operating results

for the quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q").

30.     In the Q2 2017 10-Q, the Company stated in relevant part:

**Overview of Clinical, Regulatory and Product Development Activities**

We are developing XYOSTED (testosterone enanthate) injection for testosterone replacement therapy, and submitted a 505 (b) (2) New Drug Application ("NDA") to the FDA in December 2016. The NDA submission was accepted for standard review by the FDA and assigned a Prescription Drug User Fee Act ("PDUFA") target date for completion of its review by October 20, 2017.  We conducted a multi-center, phase 3 clinical study ("QST-13-003") evaluating the efficacy and safety of testosterone enanthate administered once-weekly by subcutaneous injection using the QuickShot® auto injector in adult males diagnosed with testosterone deficiency, and we previously announced positive top-line pharmacokinetic results that showed that the primary endpoint for this study was achieved. Based upon a written response we received from the FDA related to our clinical development program for XYOSTED, we conducted an additional supplemental safety study QST-15-005.   The study included a screening phase, a treatment titration phase and a treatment phase for evaluation of safety and tolerability assessments, including laboratory assessments, adverse events and injection site assessments.  In September 2016, we announced the

successful completion of the QST-15-005 study.  The results of these two studies formed the clinical basis of our NDA submission for XYOSTED and are further discussed in the "Research and Development Programs" section below.

31.    The statements referenced in the paragraphs above were false and misleading because they failed to disclose that: (1) the Company had provided insufficient data to the FDA in connection with its NDA for Xyosted and (2) accordingly, the Company overstated the approval prospects for Xyosted.

## THE TRUTH EMERGES

32.    On October 12, 2017, the Company issued a press release entitled *Antares Pharma Provides Xyosted Regulatory Update*.  It was in this press release that the Company stated in relevant part:

> EWING, NJ, October 12, 2017 -- Antares Pharma, Inc. (NASDAQ: ATRS) today announced that, on October 11, 2017, the Company received a letter from the U.S. Food and Drug Administration (FDA) stating that, as part of their ongoing review of the Company's New Drug Application (NDA) for XYOSTED™ (testosterone enanthate) injection, they have identified deficiencies that preclude the continuation of the discussion of labeling and post marketing requirements/commitments at this time.  The letter does not specify the deficiencies identified by the FDA and there has been no further clarification of the deficiencies by the FDA at this time. We anticipate receiving further clarification from the FDA on or before the Prescription Drug User Fee Act (PDUFA) date of October 20, 2017. The Company intends to work with the FDA to understand the nature of the deficiencies once identified and resolve them as quickly as possible.
>
> On December 20, 2016, the Company submitted to the U.S. Food and Drug Administration a New Drug Application pursuant to section 505(b)(2) of the Federal Food, Drug and Cosmetic Act (FDCA), for testosterone enanthate subcutaneous injection. On February 24, 2017, the Company received a letter from the FDA notifying the Company that the FDA assigned a PDUFA target date for completion of its review by October 20, 2017. On September 22, 2017, the Company received labeling comments from the FDA which the Company responded to on September 29, 2017.

33.     On this news, the Company's share price fell $1.41, or 37.80%, to close at $2.32 on October 13, 2017.

34.     On October 20, 2017, the Company issued a press release entitled *Antares Pharma Receives Complete Response Letter From the FDA for XYOSTED*.  The press release stated in part:

> EWING, N.J., Oct. 20, 2017 (GLOBE NEWSWIRE) -- Antares Pharma, Inc. (ATRS) announced that today it has received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding the New Drug Application (NDA) for XYOSTED™ (testosterone enanthate) injection. ***The CRL indicates that the FDA cannot approve the NDA in its present form***.
>
> ***The CRL identified two deficiencies related to clinical data.***  Based on findings in studies QST-13-003 and QST-15-005, the FDA is concerned that XYOSTED™ could cause a ***clinically meaningful increase in blood pressure***.  In addition, the letter also raised a concern regarding the occurrence of ***depression and suicidality.***  The CRL did not cite any Chemistry, Manufacturing and Controls (CMC), device or efficacy issues with regard to XYOSTED™.  The next step will be to request a meeting with the FDA to further evaluate the deficiencies raised and to agree upon a path forward for a potential approval of XYOSTED™.
>
> "We are disappointed with the outcome of the review and are assessing the content of the Complete Response Letter, including the information that may be needed to resolve the deficiencies," said Robert F. Apple, President and Chief Executive Officer. "The Company remains committed to bringing XYOSTED to market and will work closely with the FDA to determine the appropriate responses to the deficiencies noted in the letter."

(Emphases added.)

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

35.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

36.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

37.     Plaintiff is a current owner of Antares stock and has continuously been an owner of Antares stock during all times relevant to Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

38.     During the aforesaid wrongful course of conduct at the Company, the Board consisted of Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

39.     The Company Board is currently comprised of seven (7) members – Apple, Garrity, Gonella, Jacob, Samson, Gueth, and Roche.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action.

40.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

41.     As a result of the aforesaid false and misleading statements, the Company has been made a defendant in a securities fraud action captioned *Smith v. Antares Pharma, Inc., et al.*, Case 2:17-cv-08945 (D.N.J.) (hereinafter "Securities Class Action.") and will be forced to expend time and treasure defending itself in that Securities Class Action.

14

42.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

43.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

44.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

45.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

46.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

47.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Apple**

48.     Defendant Apple has been President and CEO since 2016.

49.     Defendant Apple is a named Defendant in the instant action and in the Securities Class Action.

50.     Defendant Apple is not disinterested or independent, and therefore, is incapable of considering demand because Apple (as CEO) is an employee of the Company who derives substantially all of his income from his employment with Antares, making him not independent. As such, Antares cannot independently consider any demand to sue himself for breaching his fiduciary duties to Antares, because that would expose him to liability and threaten his livelihood.

51.     Accordingly, Antares lacks independence from Defendants Gueth, Jacob and Samson, defendants who are not disinterested and who exert influence over Apple's compensation by virtue of their positions as representing the entire Compensation Committee.

52.     This lack of independence and financial benefits received by Apple renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Samson**

53.     Defendant Samson is an expert in injectable manufacturing and delivery systems.

54.     Defendant Samson was formerly Group Vice President -- Worldwide Injectables of Teva Pharmaceutical Industries, Ltd., previously having served as CEO and a member of the Board of Directors of Sicor.  He was a founder and CEO of Elkins-Sinn, Inc. (now called West-ward, a division of Hikma) and Marsam Pharmaceuticals.  He is the founder and CEO of Samson Medical Technologies, a privately held company providing hospital and alternate site pharmacists with injectable drug delivery systems and programs.  Defendant Samson is the holder of five U.S.

patents pertaining to pharmaceutical manufacturing.

55.     As an expert injectable manufacturing and delivery systems, Defendant Samson had to have been aware that the Company had provided insufficient data to the FDA in connection with its NDA for Xyosted and that the Company overstated the approval prospects for Xyosted.

**Defendants Garrity, Gueth and Roche**

56.     Defendant Garrity is the Chairman of the Audit Committee.

57.     Defendant Gueth is a member of the Audit Committee.

58.     Defendant Roche is a member of the Audit Committee

59.     Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*:

**Review Procedures**

1.     Review and reassess the adequacy of this charter at least annually and recommend any proposed changes to the Board of Directors for approval.  The Audit Committee shall submit the charter to the Board of Directors for approval and have the document published at least every three years in accordance with SEC regulations.

2.     Review the Company's annual audited financial statements, quarterly financial statements, the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any other financial disclosures to be included in SEC filings prior to filing or distribution.  This review should include review of the Company's disclosures in the annual or quarterly report, significant issues and judgments regarding accounting and auditing principles and practices (including any changes to the Company's accounting principles) and a review of any transactions as to which management received a report from the independent auditors regarding the accounting principles to be applied to such transactions.  Following this review, the Audit Committee shall recommend to the Board of Directors whether the financial statements should be included in the Annual Report on Form 10-K.  The Audit Committee shall also annually prepare a report to

shareholders as required by the rules of the SEC to be included in the Company's annual proxy statement, if necessary.

3.      The Audit Committee shall oversee the Company's disclosure controls and procedures, including applicable internal control over financial reporting, and, where applicable, shall oversee the changes in internal control over financial reporting intended to address any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees that is reported to the Audit Committee.  In addition, the Audit Committee shall review and discuss the annual report of management on the effectiveness of the Company's internal control over financial reporting and receive and review the reports of the Chief Executive Officer and Chief Financial Officer required by Rule 13a-14 under the Exchange Act.

4.      The Audit Committee shall discuss periodically with management the Company's policies, guidelines and monitoring systems regarding risk assessment and risk management, as well as the Company's major financial risk exposures and the steps that management has taken to monitor and control such exposures.

5.      The Audit Committee shall meet periodically with the Compliance Officer under the Company's Code of Business Conduct and Ethics, the independent auditors and outside counsel to review the Company's policies and procedures regarding disclosures that may impact the financial statements and compliance with applicable laws and regulations and the Company's Code of Business Conduct and Ethics, including, without limitation, the Company's complaint procedures relating to accounting, internal accounting controls or auditing matters.

6.      Discuss with management the Company's earnings press releases and corporate policies with respect to earnings releases and financial information and earnings guidance provided to analysts and rating agencies.

7.      Review stock exchange or inter-dealer quotation system correspondence, proxy statement disclosures and other filings relating to the Audit Committee or its activities.

60.     Defendants Garrity, Gueth and Roche breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the allegations that (1) the Company had provided insufficient data to the FDA in connection with its NDA for Xyosted and (2) the Company overstated the approval prospects for Xyosted.

61.     Therefore, Defendants Garrity, Gueth and Roche face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

62.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

63.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

64.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

65.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to the Company, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had provided insufficient data to the FDA in connection with its NDA for Xyosted and (2) the Company had overstated the approval prospects for Xyosted.

66.     Defendants had actual knowledge of the above misrepresentations and omissions

of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

67.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

68.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending the securities lawsuit, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

69.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

70.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

71.    Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

72.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

**THIRD CAUSE OF ACTION**

**(Against Defendants for Abuse of Control)**

73.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

74.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

75.     As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

76.     As a result of the misconduct alleged herein, Defendants are liable to the Company. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**(Against Defendants for Waste of Corporate Assets)**

77.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

78.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had provided insufficient data to the FDA in connection with its NDA for Xyosted and (2) the Company had overstated the approval prospects for Xyosted.

79.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

80.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Against Defendants for Violations of Section 14(a)
### of the Securities Exchange Act of 1934)

81.     Plaintiff incorporates by reference and re-alleges each and every allegation above as though fully set forth herein.

82.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

83.     Here, the Company's Proxy Statement for 2017 violated Section 14(a) and Rule 14a-9 by omitting material facts.  Defendants made false and/or misleading statements and/or failed to disclose that (1) the Company had provided insufficient data to the FDA in connection with its NDA for Xyosted and (2) the Company had overstated the approval prospects for Xyosted.

84.     The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC that are incorporated by reference. Item 303(A)(3)(II) of Regulation S-K ("Item 303") provides guidance on what should be included in incorporated forms.

85.     Here, known trends existed at the time of the misleading statements and omissions in the Company's 2017 Proxy (which incorporated the Company's annual report), which failed to contain the disclosures required by Item 303.

86.     Had this information been known, Antares shareholders would not have voted to re-elect the offending directors.

87.     As a consequence of the foregoing, the Company was damaged as a result of Defendants' material misrepresentations and omissions.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' wrongful conduct, including breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 17, 2018

                    **GAINEY McKENNA & EGLESTON**


                    By: */s/ Barry J. Gainey*
                        Barry J. Gainey (BG7560)
                    95 Route 17 South, Suite 310
                    Paramus, NJ 07652
                    Telephone: (201) 225-9001
                    Facsimile: (201) 225-9002
                    Email: bgainey@gme-law.com

                    -and-

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***